IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MGE UPS SYSTEMS, INC.,          §
                                §
            Plaintiff           §
                                §
vs.                             §     CIVIL ACTION NO. 4:04-CV-445-Y
                                §
FAKOURI ELECTRICAL              §
ENGINEERING, INC., et al.       §
                                §
            Defendants          §

**ORDER DENYING MOTION TO DISMISS, DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND
PARTIALLY GRANTING REMAINING MOTIONS FOR SUMMARY JUDGMENT**

Pending before the Court are four motions for summary judgment and one motion to dismiss: (1) plaintiff MGE UPS Systems, Inc.'s motion for partial summary judgment [doc. # 241], filed May 9, 2005; (2) defendant Fakouri Electrical Engineering, Inc.'s amended motion for partial summary judgment [doc. # 249], filed May 9, 2005; (3) defendants Michael I. Khalil and Eldrick Lee Lofton's motion for summary judgment [doc. # 247], filed May 9, 2005; (4) defendants DC Group, Inc. and Andrew Powell's motion for summary judgment [doc. # 243], filed May 9, 2005; and (5) Fakouri, Khalil, and Lofton's motion to dismiss MGE's RICO claim [doc. # 240], filed May 6, 2005. For the reasons discussed below, the Court DENIES Fakouri, Khalil, and Lofton's motion to dismiss [doc. # 240] and MGE's motion for partial summary judgment [doc. # 241]. The Court PARTIALLY GRANTS Fakouri's amended motion for partial summary judgment [doc. # 249], Khalil and Lofton's motion for summary judgment [doc. # 247], and DC Group and Powell's motion for summary judgment [doc. # 243].

I. BACKGROUND

This case involves computer technology and the difficulties inherent in creating or using

software.  MGE is a California corporation that manufactures uninterruptible power supplies ("UPS") systems, which ensure an uninterruptible source of electrical power.  UPS systems are used by entities such as the Pentagon, NASA, airport security centers, banks, and law firms.  MGE offers UPS systems, inverters, rectifiers, power-management software, active harmonic conditioners, and surge suppressors.  MGE's technology for these products includes:  (1) hardware that provides an uninterruptible power source for its customers; (2) software code that allows for the expedited servicing of the hardware; and (3) operating data necessary for the efficient servicing and maintenance of MGE-manufactured UPS systems.

Two of MGE's UPS systems are the Galaxy EPS 3000 and the Comet EPS 6000.  These UPS systems include circuit boards with semiconductor chips that act as the UPS system's brain and control its operations.  The circuit boards occasionally need to be replaced for either repair or to improve performance.  Realizing that replacement of a circuit board could be time consuming and expensive, MGE developed Muguet and Pacret, which are software programs that can directly access and modify the programming of the software imbedded on the semiconductor chips in the circuit board.  In many cases, this allows MGE to service a UPS system without having to replace the circuit board.  MGE technicians once serviced UPS systems by connecting a laptop computer, which includes a CD-ROM disk containing Muguet and Pacret,[1] inserting a hardware key or dongle[2] to the laptop, and running either Muguet or Pacret.  The Muguet and Pacret software cut the servicing time for a UPS system in half.

---

[1] MGE now allows its technicians access to Muguet or Pacret through a restricted database; thus, a CD-ROM disk is no longer necessary.

[2] A dongle must be plugged into the laptops before the Pacret or Muguet software will begin operating.  The dongles contain expiration dates and passwords, which prevents the dongle from activating the software if the laptop's date is past the dongle's expiration date.

Fakouri is California company that designs, engineers, and installs data-center power facilities, telecommunication power plants, emergency generators, and UPS systems. Fakouri also provides preventive maintenance and emergency services for UPS systems. Fakouri admits that it used copies of Muguet and Pacret to service its customers' MGE-manufactured UPS systems. (Fakouri Resp. to MGE's Mot. for Partial Summ. J. at 2.) Likewise, DC Group services critical power applications. This Minnesota company provides critical-power-systems engineering and maintenance for UPS systems. DC Group also admits that it has copies of Muguet and Pacret.

Khalil began working for MGE as a service engineer in 1999. He signed a confidentiality agreement, which stated that he would "keep in confidence all proprietary and confidential information of [MGE]." (MGE Consol. App. at 369, 376.) In late 2003, Phil McAndrew, the vice-president for operations for Fakouri, contacted Khalil about going to work for Fakouri based on his experience with UPS systems and static transfer switches. Because of a slight increase in pay offered by Fakouri and because Khalil was no longer eligible for overtime pay with MGE, Khalil told his regional manager, Ron Kent, that he was considering leaving MGE.

On January 2, 2004, Khalil serviced an MGE customer's UPS system and used the Pacret and Muguet software that were on his MGE laptop. That same day, Khalil's manager, Ron Kent, and Khalil discussed the job offer from Fakouri. After Kent told Khalil that he could not offer Khalil more money to stay, Khalil tendered his resignation and gave two-weeks' notice. Thus, Khalil's last day with MGE was January 16.[3] Kent told Khalil not to perform any more jobs for MGE and to arrange to turn in his MGE equipment to his team leader, James Adams. Khalil and Adams arranged to meet on January 3 so Khalil could return the following to MGE: (1) a Panasonic

---

[3] Khalil considered his last day with MGE to be January 3. He was paid his salary through January 16 and for his accumulated vacation time.

DF-72 laptop with a dongle; (2) a Panasonic CF-71 laptop; (3) a cellphone; (4) a pager; and (5) a set of MGE tools.  Khalil turned in all the equipment, with the exception of the Panasonic CF-71 laptop.  Adams agreed to allow Khalil to turn in the CF-71 laptop later so Khalil could remove personal files, such as family photos, that he had stored on it.  Although Khalil and Adams tried to arrange a time to meet so Khalil could return the CF-71 laptop,  a meeting never was arranged, and Khalil never returned the laptop.  Khalil started his job with Fakouri as a field engineer on January 5.

Lofton began working for MGE in September 2000 as a field service engineer.  He also signed a confidentiality agreement with MGE.  In late 2003, McAndrew contacted Lofton about coming to work for Fakouri because of Lofton's knowledge of UPS systems.  After lengthy negotiations between Lofton and Kent, Lofton finally tendered his resignation to MGE in November 2003.  On November 13, Lofton met with Kent for his exit interview.  Lofton returned his laptop computer, pager, cell phone, charger, and dongle.

Khalil and Lofton were each employed by Fakouri when, on June 9, 2004, Lofton contacted Khalil and asked for help with a job in Irving, Texas.  Khalil showed up wearing a shirt with an MGE logo.  Lofton was wearing a shirt with a Fakouri logo.  Lofton told Khalil that they were going to service a Galaxy EPS 3000 UPS system, which was manufactured by MGE.  When Lofton checked his Fakouri laptop, its monitor was malfunctioning.  Khalil told Lofton that he had his CF-71 MGE laptop in his car,[4] and they decided to take both laptops to the job site.  What Khalil and Lofton did not know was that MGE had hired a private investigator, Cecil Mixon, to determine if Fakouri was unlawfully using MGE's software to service MGE-manufactured UPS systems.  Mixon

---

[4]There is some evidence that Khalil put the CF-71 laptop in his car a few days earlier in anticipation of meeting with Adams before Adams left on a trip. This meeting, like the others, fell through.

was the Irving customer and had arranged for the UPS system's frequency to be set at 50 Hz.[5]

When Khalil and Lofton arrived, Mixon asked Khalil about his MGE shirt. Khalil told Mixon that he and Lofton had once worked for MGE, but that they were currently employed by Fakouri. Mixon showed Khalil and Lofton the UPS system and told them that the prior company had used it with a 50 Hz setting. To change the frequency setting, Khalil and Lofton had to access the UPS system with software. Because Lofton's Fakouri laptop was malfunctioning, Lofton and Khalil decided to connect Khalil's MGE CF-71 laptop to the UPS system. They also inserted Lofton's Fakouri dongle to the CF-71 laptop. When Khalil started the software, Mixon saw "MGE" appear on the screen of the CF-71 laptop. Khalil also accessed a file on the CF-71 laptop to look at a customer start-up data sheet. Khalil then changed the frequency setting to 60 Hz.

On June 11, 2004, Powell, a field engineer with DC Group, was dispatched to a service call for a company in Irving, Texas. This service call was also a sting operation set up by Mixon on MGE's behalf. Powell connected his laptop to the UPS system, and Mixon saw "MGE" appear on the laptop screen. Powell used MGE's software to service the UPS system. When Powell was finished, he told Mixon that he had reset the frequency on the UPS system from 50 Hz to 60 Hz.

On June 16, MGE brought suit against Fakouri for copyright infringement, misappropriation of trade secrets, tortious interference with existing and prospective business relations, violation of the Racketeer Influenced Corrupt Organization Act (RICO),[6] conspiracy, trademark infringement, conversion, and unfair competition. MGE sued Khalil and Lofton for copyright infringement, misappropriation of trade secrets, violation of RICO, trademark infringement, conversion, breach of employment contract, and unfair competition. MGE further brought suit against DC Group and

---

[5] For this UPS system to operate, it must be set at 60 Hz.

[6] 18 U.S.C.A. § 1961-68 (West 2000 & Supp. 2005).

Powell for copyright infringement, misappropriation of trade secrets, violation of RICO, trademark infringement, conversion, violation of the Digital Millennium Copyright Act (DMCA),[7] and unfair competition.  After litigation began, Fakouri turned over six laptops to the United States marshal's office:  five IBM Think Pads and Khalil's CF-71 Panasonic laptop.  All parties now move for summary judgment.

## II. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party moving for summary judgment has the initial burden of demonstrating that it is entitled to a summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party need not produce evidence showing the absence of a genuine issue of material fact with respect to an issue on which the nonmovant bears the burden of proof.  Rather, in that situation, the moving party need only point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmovant's claim.  *Id.* at 323-35.  Where, however, the moving party bears the burden of proof on the claim upon which it seeks summary judgment, it must present evidence that establishes "beyond peradventure *all* the essential elements of the claim or defense."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

When the moving party has carried its summary-judgment burden, the nonmovant must go beyond the pleadings and by its own affidavits or by the depositions, answers to interrogatories, or admissions on file set forth specific facts showing that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e).  This burden is not satisfied with some metaphysical doubt as to the material facts,

---

[7]17 U.S.C.A. § 1201(a)(2) (West 2005).

by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

In making its determination on the motion, the Court must look at the full record in the case. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).  Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992).  Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

## III. COPYRIGHT INFRINGEMENT

MGE moves for summary judgment on its claim of copyright infringement against Fakouri, Khalil, and Lofton.  Fakouri, Khalil, Lofton, DC Group, and Powell argue that MGE cannot prove its copyright-infringement claims against them as a matter of law.  To prove copyright infringement, MGE must establish (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original and copyrightable. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004).

### A. FAKOURI, KHALIL, AND LOFTON

MGE argues that Fakouri, Khalil, and Lofton infringed on MGE's copyright by accessing and using the Muguet and Pacret software.  MGE also contends that Fakouri's competing FEE Tool infringes on its copyright.  Fakouri, Khalil, and Lofton argue that MGE has no evidence either that

it owns the copyright to the software or that they copied the software.   Fakouri further asserts that it is immune from liability under the first-sale doctrine.   Fakouri, Khalil, and Lofton argue that MGE's inequitable conduct bars its copyright-infringement claim.

### 1. First-Sale Doctrine

Fakouri argues that it is shielded from a copyright-infringement claim because it lawfully owns the five copies of Muguet and Pacret contained on five of the impounded laptops.[8]   Indeed, if a lawful owner of a copy of a computer program copies the software as a necessary step in its normal use, the owner is immunized from an infringement allegation.   *See* 17 U.S.C.A. § 117 (West 2005).   Under this first-sale doctrine, the buyer of a particular copy of the copyrighted work is authorized to use or dispose of that particular copy without regard to the desires or policies of the copyright holder so long as he does not publish or produce other copies of the work.   *See id.* § 109(a) (West 2005).   As Fakouri states, if MGE transferred ownership of copies of Muguet and Pacret, the first-sale doctrine would bar MGE from claiming copyright infringement; however, the first-sale doctrine would not apply if MGE simply licensed the software.

Fakouri points to evidence that, in 1998, MGE provided "software [namely, Muguet and Pacret] and tools (D[o]ngle) relating to MGE" to one of its customers—Sprint—who, in turn, gave the software and dongles to Fakouri for servicing purposes.   (4 Fakouri App. at 1237.)   However, this agreement also states that Sprint cannot use the "software and tools in competition with MGE."   Fakouri also points to summary-judgment evidence showing that MGE sold copies of Muguet and Pacret along with the dongle and UPS system to Fakouri and Sprint.   (1 Fakouri App. at 8-11; 3 Fakouri App. at 888-91, 893-931, 1093-1111; 4 Fakouri App. at 1312-15; Fakouri Resp. to MGE Partial Summ. J. Mot. at 22-30.)   But MGE has proffered evidence that the transactions were

---

[8]Fakouri does not address the copy found on Khalil's CF-71 laptop.

intended to be mere licenses. (4 Fakouri App. at 1314-15; 1 MGE Consol. App. at 81, 261-62; MGE Supp. App. at 920-921.)  The exhaustive briefing by MGE and Fakouri on this doctrine and its application to the facts of this case clearly show that there is a fact issue regarding whether Fakouri lawfully acquired the copies of Muguet and Pacret.

## 2. Inequitable-Conduct Bar

Fakouri, Khalil, and Lofton assert that MGE's inequitable conduct, i.e., copyright misuse, bars its copyright-infringement claim.  In short, Fakouri, Khalil, and Lofton argue that MGE equipped its UPS systems with blocking software[9] that prevented any other company from servicing MGE-manufactured UPS systems.  MGE argues that its evidence shows that Muguet and Pacret are merely innovations that assist in diagnosing the unit and that MGE-manufactured UPS systems can be serviced manually.  Fakouri, Khalil, and Lofton respond that their evidence shows that MGE deceptively hid from its customers the fact that, to receive timely service, they would have to go through MGE and that MGE was refusing to sell parts to Fakouri or Fakouri's customers.  Once again, the copious summary-judgment evidence shows nothing more than a fact issue regarding whether MGE dealt unfairly with its competitors through the creation and use of Muguet and Pacret and whether MGE-manufactured UPS systems can be serviced without the use of Muguet and Pacret.  (1 MGE Consol. App. at 27, 129, 139, 152, 154; 2 MGE Consol. App. at 437-39, 453; 1 Fakouri App. at 3; 2 Fakouri App. at 503-04, 733-44; 3 Fakouri App. at 893, 896-97, 995-99; 4 Fakouri App. at 1195, 1200-01, 1326-27, 1332-33, 1643.)

## 3. Ownership of Copyright

---

[9]Primarily, Fakouri, Khalil, and Lofton point to the fact that unless a technician has a copy of Muguet and Pacret, which includes an admission protocol, along with a dongle, the UPS system cannot be serviced.  In other words, MGE attempted to create a monopoly regarding service on their UPS systems through the admission-protocol code sequence.

MGE registered Muguet and Pacret with the United States Copyright Office.  Fakouri, Khalil, and Lofton argue that MGE has not provided any proof of a proper chain of title from Merlin Gerin—the actual owner of the software—to MGE; thus, there is no evidence of ownership.  Various corporate entities, including Merlin Gerin, EPE, and Square D, were combined in a series of transactions to eventually become MGE-UPS Systems SA (MGE France), which is the owner of Muguet and Pacret.  MGE France granted MGE an exclusive license for this software in the United States.  Fakouri, Khalil, and Lofton, while not disputing the existence of the licensing agreement between MGE France and MGE, assert that the partial contribution agreements between Merlin Gerin and Schneider Electric and between Schneider Electric and MGE did not effectively transfer ownership of the Muguet and Pacret copyrights.  They focus on the fact that the agreements do not specifically identify or define Muguet and Pacret, which is required under French law.  MGE argues that the language of the contribution agreements shows that the companies intended to transfer all assets and liabilities of Merlin Gerin to Schneider Electric and then from Schneider Electric to MGE France.

In the context of contract interpretation, if there is a choice between reasonable interpretations of the contract, a material fact issue exists concerning the parties' intent, which would preclude summary judgment.  *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004).  Further, if a contract is ambiguous, summary judgment is inappropriate because the interpretation of a contract is a question of fact.  *Geoscan, Inc. of Tex. v. Geotrace Techs., Inc.*, 226 F.3d 387, 390 (5th Cir. 2000).  In view of the parties' arguments and summary-judgment evidence, there is a fact issue regarding whether the parties intended a complete merger with a transfer of assets that would have included any copyright to Muguet and Pacret.  Summary judgment would not be appropriate regarding whether MGE owns the copyright.

10

4. Copying

MGE argues that it is entitled to judgment as a matter of law because there were copies of Muguet and Pacret on the six impounded laptops and on a later-impounded data disk.  Fakouri concedes that the laptops have copies of Muguet and Pacret and that it used those laptops to service its customers' MGE-manufactured UPS systems.  However, it asserts that it received those copies lawfully under the first-sale doctrine and that there is no evidence that the software on the impounded laptops was copied from another source.  To prove actionable copying, MGE must show that Fakouri, Khalil, and Lofton had access to Muguet and Pacret and that the works are substantially similar.  *See Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004).  MGE does not need proof of actual, direct copying to prove copyright infringement; thus, indirect proof that Fakouri, Khalil, and Lofton had access to Muguet and Pacret is sufficient.  *See id.*  As discussed above, there is a fact issue regarding the applicability of the first-sale doctrine to the copies of Muguet and Pacret found on the laptops.  Further, there is a fact issue regarding whether Khalil and Lofton copied Muguet and Pacret.  Although Khalil and Lofton aver that, at most, their use of Muguet and Pacret in June 2004 was a one-time aberration, MGE has proffered evidence that arguably shows Khalil copied Muguet and Pacret from the CF-71 laptop and that Lofton had access to the impounded laptops after their employments with MGE ended.[10]  (2 Fakouri App. at 508-09, 1653; MGE Supp. App. at 1092-96, 1106, 1137-38, 1296, 1353; 2 MGE Consol. App. at 129-30; 2 MGE Consol. App. at 484.)

MGE also argues that the FEE Tool includes a substantially similar copy of a code segment

---

[10]Contrary to MGE's argument, Khalil and Lofton have not confessed judgment.  They merely argue that, at most, they are liable for a one-time infringement.  They, like Fakouri, argue that MGE is completely barred from recovery by inequitable conduct and by the fact that MGE does not own the copyright.

from Muguet and Pacret. Apparently, without this code segment, the FEE Tool could not establish a communications link with an MGE-manufactured UPS system. In other words, this code segment introduces and authorizes the laptop to access the UPS system for diagnostic purposes. Thus, MGE insists, the FEE Tool infringes on MGE's copyright.

As previously stated, to prove that Fakouri copied the FEE Tool from Muguet and Pacret, MGE must show that Fakouri used Muguet and Pacret to create the FEE Tool, which can be shown if Fakouri had access to the copyrighted work and there is substantial similarity between the FEE Tool and Muguet and Pacret. *See Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003). Fakouri admits that it had access to Muguet and Pacret, but asserts that MGE cannot show the requisite similarity. Indeed, Fakouri's forensic computer expert stated that the FEE Tool is not substantially similar to Muguet and Pacret. (5 Fakouri App. at 1696.) However, MGE has produced testimony indicating that the FEE Tool was developed through reverse engineering of Muguet and Pacret. (1 MGE Consol. App. at 59-70, 194.) One of MGE's computer experts avers that MGE's access-sequence protocol is present in the FEE Tool and was used to create the FEE Tool. (2 MGE Consol. App. at 467.) There is a fact issue on probative similarity. Fakouri's argument that the access-sequence protocol is not copyrightable merely contributes to this fact issue and does not preclude MGE's recovery as a matter of law.

## B. DC GROUP AND POWELL

DC Group and Powell move for summary judgment on MGE's copyright infringement claim because (1) MGE has failed to prove that it owns the copyright, (2) MGE cannot prove that DC Group copied any software, (3) DC Group owns its copy of Muguet and Pacret under the first-sale doctrine, (4) it is barred by equitable estoppel, (5) it is barred by laches, (6) it is barred by the statute

of limitations, (7) it is barred by MGE's inequitable conduct, i.e., copyright misuse.[11]

As discussed above, there is a fact issue regarding whether MGE owns the copyright. A fact issue also exists regarding whether DC Group and Powell copied Muguet and Pacret. DC Group and Powell have produced evidence that they bought their copy of Muguet and Pacret in the open market, which would support their assertion that they did not copy Muguet and Pacret. (Frank Aff. at 2-3.) Although MGE does not dispute that DC Group bought Muguet and Pacret from a third party, MGE has proffered evidence that indicates that a version of Muguet and Pacret, which had been altered to permit their use without a dongle, had been copied on three of DC Group's laptops. (MGE App. to Resp. at 2-4.) This altered version of Muguet and Pacret is also fatal to DC Group and Powell's argument that they are entitled to judgment as a matter of law based on the first-sale doctrine. MGE has produced evidence suggesting that an authorized copy of Muguet and Pacret would not contain a disabled security feature. (MGE App. to Resp. at 16.) This raises a fact issue regarding whether DC Group's title to its copy of Muguet and Pacret was lawful, which is material to its first-sale defense. *Cf. Am. Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661, 665 (5th Cir. 1978) (stating holder of copy acquires no better title than seller); *Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 2d 995, 1007-08 (S.D. Tex. 2000) (holding first-sale claimant must trace chain of title to prove applicability of doctrine).

DC Group and Powell also assert that because MGE "must have known" that DC Group was using Muguet and Pacret since early 2001 based on the fact that MGE provided parts and technical support to DC Group since then, its copyright-infringement claim is barred by equitable estoppel, laches, and limitations. (DC Group Br. in Supp. at 8-9.) The inference DC Group and Powell urge

---

[11]MGE argues that DC Group and Powell's motion for summary judgment should be summarily denied because they did not timely comply with MGE's discovery requests. As pointed out in DC Group and Powell's reply, discovery was delayed by settlement discussions with MGE's consent.

this Court to draw—that MGE knew DC Group was using Muguet and Pacret—is one that only a fact-finder can draw.  Indeed, the previous rumors of infringement that DC Group and Powell seem to rely on to prove their affirmative defenses fall far short of the quantum of evidence necessary for summary judgment.[12]  (MGE App. to Resp. at 16-17.)  Regarding their assertion that MGE's claim is barred by its inequitable conduct, DC Group and Powell rely exclusively on Fakouri's briefing on this issue.  For the reasons stated above, DC Group and Powell are not entitled to summary judgment based on inequitable conduct.

## IV. RICO VIOLATION

MGE claims that Fakouri, Khalil, Lofton, DC Group, and Powell have violated RICO by engaging in a pattern of racketeering by copying and using Muguet and Pacret and distributing and disclosing confidential and proprietary information regarding Muguet and Pacret through an "underground network."  (Am. Comp. at 41-42, 46-47.)  To successfully plead a RICO claim, MGE must allege (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity.  *See Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir. 1989).  All defendants move for summary judgment, and Fakouri, Khalil, and Lofton also move to dismiss this claim for failure to state a claim.

### A. MOTION TO DISMISS UNDER RULE 12(B)(6)

"A motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."  *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105 (1983).  This Court must accept as true all well-pleaded, nonconclusory allegations in the complaint, and must liberally construe the complaint in favor of

---

[12]DC Group and Powell do not refer to any summary-judgment evidence to support these affirmative defenses upon which they carry the burden of proof.

MGE.  *See id.*  This Court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt from the face of MGE's pleadings that it can prove no set of facts in support of its RICO claim that would entitle it to relief.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Garrett v. Commonwealth Mortgage Corp.*, 938 F.2d 592, 594 (5th Cir. 1991); *Kaiser*, 677 F.2d at 1050.  After reviewing the complaint, the motion, the response, the reply, and the fact that these arguments were considered and rejected at the time this Court granted MGE leave to file an amended complaint in August 2004, this Court concludes that MGE has sufficiently pleaded a RICO cause of action to survive a dismissal motion.

## B. SUMMARY-JUDGMENT MOTIONS

Fakouri, Khalil, Lofton, DC Group, and Powell argue that they are entitled to summary judgment because there is no evidence of conduct that may constitute a substantive RICO violation, of a RICO enterprise, or of a pattern of racketeering activity.  MGE asserts that the RICO enterprise alleged is an association-in-fact enterprise, which is a "trade group" consisting of "an underground network of field engineers" sharing illegally obtained software, of which all defendants are members.  (Am. Comp. at 14-15, 42.)  An enterprise is "any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not a legal entity."  18 U.S.C.A. § 1961(4) (West Supp. 2005).  An association-in-fact enterprise requires an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure.  *See Old Time Enters., Inc. v. Int'l Coffee Corp.*, 862 F.2d 1213, 1217 (5th Cir. 1989).  It further must have a common or shared purpose.  *Shaffer v. Williams*, 794 F.2d 1030, 1032 (5th Cir. 1986).  Other than its unsupported averments in its amended complaint, MGE points to McAndrew's testimony that there is a "black market" for computer software and equipment:

Q. Are you telling me that there is a – some kind of market out there for the laptops and the software?

A. I'm telling you that there is one hell of a big market out there that's going on in this industry for various devices.

Q. Including the equipment?

A. Including equipment.

Q. Including the software[?]

A. Including the software.

Q. And it's all done, for lack of a better phrase, in the black market.

A. You know, when you talk about "black market," that is a line where, one, we don't deal with it, okay; but at the same time, some of these they're claiming are legitimate, and I have no idea if they are or are not.

Q. Well, what you're telling me is there's a black market but you don't participate in it.

A. I'm telling you that there is software out on the street, in numerous forms, coming from many different entities, all right?  Some, I'm sure, are what you're terming, and what I'm including, as probably black market, and there are others out there that the people are claiming are perfectly legal. And with that, I . . . don't know.  but, no we have not bought any.  (MGE Supp. App. at 1071.)

MGE cites no other evidence to support its allegation of an association-in-fact enterprise.  (MGE Resp. to Khalil & Lofton Mot. for Summ. J. at 36-37; Khalil & Lofton Reply at 24-25.) McAndrew's deposition testimony falls far short of establishing a fact issue on the existence of an enterprise under RICO.  *See, e.g., id.* at 1033.  Thus, Fakouri, Khalil, Lofton, DC Group, and Powell are entitled to summary judgment on MGE's RICO allegation.

## V. TRADEMARK INFRINGEMENT

MGE alleges that Fakouri, Khalil, and Lofton infringed on MGE's trademark when Khalil

wore an MGE shirt on the June 9, 2004, service call.  (MGE Resp. to Fakouri Am. Mot. for Summ. J. at 41.)  It further argues that DC Group and Powell infringed its trademark when Powell's computer displayed an MGE "splash" screen during the June 11, 2004, service call.  (MGE Resp. to DC Group Mot. for Summ. J. at 18.)  To prove trademark infringement, MGE must show that (1) a defendant used MGE's registered mark without consent, (2) the use was in connection with the sale of goods or services, and (3) the use was likely to create confusion among consumers.  *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 543 (5th Cir. 1998).  Fakouri, Khalil, Lofton, DC Group, and Powell argue that there is no evidence establishing the third factor, i.e., confusion.  MGE points to evidence that Mixon was initially "confused" when he saw Khalil in a MGE shirt, but that Khalil and Lofton were clear that they worked for Fakouri.  (2 MGE Consol. App. at 454.)  If there was any confusion on Mixon's part, which seems highly unlikely given his purpose in being present, it was quickly allayed, and is insufficient to raise a fact issue regarding the confusion necessary to support a trademark-infringement claim.  *See Society of Fin. Exam'rs v. Nat'l Assoc. of Certified Fraud Exam'rs, Inc.*, 41 F.3d 23, 228 (5th Cir. 1995), *cert. denied*, 515 U.S. 1103 (1995); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.), *cert. denied*, 449 U.S. 899 (1980).  This is especially true considering that Lofton was wearing a Fakouri shirt.  Further, there is no evidence, and MGE points to none, that establishes any actual confusion or likelihood of confusion through Powell's service call.  Fakouri, Khalil, Lofton, DC Group, and Powell are entitled to judgment as a matter of law on MGE's trademark-infringement claim.

## VI. BREACH OF CONTRACT

MGE claims that they are entitled to summary judgment because Khalil and Lofton breached their confidentiality agreements with MGE when they used or disclosed copies of Muguet and Pacret

they obtained during their employment with MGE.  Khalil and Lofton also urge this Court to enter judgment as a matter of law in their favor on this claim.  Although Khalil and Lofton state that they kept MGE's proprietary and confidential information confidential (1 Fakouri App. at 15-18; 2 Fakouri App. at 505; 4 Fakouri App. at 1643-44), MGE has produced evidence that Khalil and Lofton accessed MGE's software on the CF-71 laptop during the June 2004 service call and that Khalil accessed MGE data after he left MGE's employ.  (1 MGE Consol. App. at 132, 140; 2 MGE Consol. App. at 453-54, 483-85, 748-49.)  This evidence creates a fact issue on breach of MGE's confidentiality agreements.

## VII. DMCA VIOLATION

MGE claims that DC Group and Powell violated the DMCA when they "apparently acquired a 'hacked' copy of the software that no longer required the dongle." (Am. Comp. at 43.)  DC Group and Powell argue that there is no evidence that they altered the software to remove the safety feature. But as MGE points out, it has produced evidence that raises a fact issue regarding whether DC Group and Powell violated the DMCA by using the "hacked" software.  (MGE App. to Resp. at 2-3.)

## VIII. STATE-LAW CLAIMS

### A. Choice of Law:  California v. Texas

Fakouri argues that because a conflict exists between California law and Texas law regarding MGE's state-law claims, this Court must apply California law under choice-of-law principles.[13] First, although Fakouri applied California law to all of MGE's state-law claims, Fakouri limits its

---

[13]Khalil, Lofton, DC Group, and Powell do not raise a conflict-of-law point regarding MGE's state-law claims; they brief these claims solely under Texas law.

conflict-of-law argument to MGE's misappropriation-of-trade-secrets and tortious-interference claims. In other words, the only conflicts between California law and Texas law to which Fakouri points apply to misappropriation of trade secrets and tortious interference. (Fakouri Reply at 21-22, 27.) Thus, this Court will likewise limit its conflict-of-law analysis to these two claims.

To determine which law prevails in the case of a conflict, both Fakouri and MGE agree that the most-significant-relationship test stated in the Second Restatement of Conflict of Laws is the appropriate test:

> Contacts to be taken into account in applying the principles of [the state with the most significant relationship] to determine the law applicable to an issue include:
>
> (a)     the place where the injury occurred,
>
> (b)     the place where the conduct causing the injury occurred,
>
> (c)     the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d)     the place where the relationship, if any between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971). Although both MGE and Fakouri are California corporations, the gravamen of MGE's misappropriation and tortious-interference complaints—Khalil's, Lofton's, and Powell's actions during the 2004 service calls and in acquiring copies of Muguet, Pacret, and other proprietary information—occurred in Texas. Further, Fakouri, using the FEE Tool, services several clients in Texas. (MGE Supp. App. at 918-19, 1106, 1186-1283.) Finally, as argued by MGE, it seems that there is no actual conflict between California law and Texas law regarding tortious interference. (MGE Resp. at 45 n.25.) MGE's arguments in its response are convincing, and this Court will apply Texas law to MGE's claims. *See id.* cmt. f.

## B. Misappropriation of Trade Secrets

MGE argues that Fakouri misappropriated MGE's trade secrets by copying the admission protocol from Muguet and Pacret and incorporating it into the FEE Tool.  MGE believes Khalil and Lofton committed the same tort by copying Muguet and Pacret before and after their employment with MGE and by accessing MGE's proprietary manuals.  Likewise, DC Group and Powell had a copy of a disk with trade secrets, e.g., "schematic diagrams for circuit boards and other component parts manufactured by MGE and used in the MGE units."  (MGE Resp. to DC Group Mot. for Summ. J. at 23.)  Their possession of this disk reduced "MGE's competitive advantage."  (MGE Resp. to DC Group Mot. for Summ. J. at 24.)

To prove misappropriation of trade secrets, MGE must show (1) the existence of a trade secret, (2) a breach of a confidential relationship or improper discovery of the trade secret, and (3) use of the trade secret without authorization.  *See Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 840 n.3 (5th Cir. 2004).  As shown by MGE's, Fakouri's, and Khalil and Lofton's briefing on this issue, there are multiple fact issues regarding these elements that bar summary judgment. (MGE Mot. for Partial Summ. J. at 27-31; Fakouri Resp. at 37-45; Khalil & Lofton Resp. at 16-38; MGE Reply to Fakouri at 24-26; MGE Reply to Khalil & Lofton at 17-22.)  Indeed, the fact issues are so numerous, it would be needlessly repetitive to list them here because they are fully set out in the parties' briefs.  Likewise, fact issues based on DC Group and Powell's seemingly uncontested possession of the data disk preclude summary judgment in favor or DC Group or Powell.  (DC Group Mot. for Summ. J. at 10; MGE Resp. at 23-24; DC Group Reply at 13.)

## C. Tortious Interference

To prove tortious interference with existing contracts as well as with prospective business relations, as MGE alleges against Fakouri, MGE must show (1) the existence of a contract subject

to interference, (2) a willful and intentional act of interference, (3) such act was a proximate cause of damage, and (4) actual damage or loss occurred. *See Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004). To prove tortious interference with prospective business relationships, MGE must show (1) a reasonable probability that MGE would have entered into a business relationship, (2) an independently tortious or unlawful act by Fakouri that prevented the relationship from occurring, (3) Fakouri did such act with a conscious desire to prevent the relationship from occurring or Fakouri knew that the interference was certain or substantially certain to occur as a result of the conduct, and (4) MGE suffered actual harm or damages as a result of Fakouri's interference. *See The Decorative Ctr. of Houston, L.P. v. Direct Response Publ'ns, Inc.*, 264 F. Supp. 2d 535, 556 (S.D. Tex. 2003).

Fakouri asserts that there is no evidence that MGE had any existing contracts with third parties that were breached or that Fakouri knew about the contracts and engaged in unjustified or wrongful conduct to induce the third party to breach its contract with MGE. MGE points to three discrete contracts it had with customers to service UPS systems that were either cancelled or not renewed after contact from Fakouri. (MGE Supp. App. 918-19; MGE App. at 854.) Although Fakouri raises compelling arguments suggesting that MGE has not proven this claim, the Court concludes that fact issues exist that bar summary judgment.

21

D. CONSPIRACY

To establish its conspiracy claim against Fakouri, MGE must show (1) two or more persons, (2) an object to be accomplished, (3) a meeting of minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as the proximate result. *See Flourine On Call*, 380 F.3d at 866. MGE asserts that Lloyd Sisemore, an employee of Sprint, and McAndrew conspired with Fakouri to deprive MGE of its rights to Muguet and Pacret. MGE points to evidence showing that while Sisemore initially denied being hired by Fakouri as a consultant on this litigation, McAndrew admitted that Fakouri had paid Sisemore approximately $3,000 for consulting services. (MGE Supp. App. at 1088, 1098-1100, 1145.) It further cites evidence that Sisemore apparently gave a dongle to McAndrew. (MGE Supp. App. at 1084, 1089, 1146.) Apparently, MGE believes that this is sufficient proof to show that McAndrew and Sisemore agreed to lie about the fact that MGE gave software and dongles to Sprint. This is not sufficient evidence to raise an issue as to the existence of a conspiracy. Fakouri is entitled to summary judgment.

E. CONVERSION

In Texas, the tort of conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the property of another, to the exclusion of and inconsistently with the owner's rights. *50-Off Stores, Inc. v. Banques Paribas (Suisse), S.A.*, 180 F.3d 247, 253 (5th Cir. 1999), *cert. denied*, 528 U.S. 1078 (2000). MGE argues that Fakouri, Khalil, Lofton, DC Group, and Powell unlawfully converted MGE's protected information, such as Muguet, Pacret, and other information stored on the data disk. The defendants assert, in response, that there is no evidence that they did not have lawful title to the information and that MGE retained title once that information was released to customers. As discussed above, there are fact issues regarding whether Fakouri, Khalil, Lofton, DC Group, and Powell had a right to possess the information and whether MGE

22

released the title to the information.

### F. UNFAIR COMPETITION

MGE's umbrella claim for unfair competition is based on its allegations of misappropriation of trade secrets and copyright infringement.  *See generally Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 19754) (stating unfair-competition claim acts as an umbrella for all statutory and nonstatutory claims "arising out of business conduct which is contrary to honest practice in industrial or commercial matters").  Fakouri, Khalil, Lofton, DC Group, and Powell assert that because MGE's allegations of misappropriation of trade secrets and copyright infringement fail, MGE likewise cannot establish its unfair-competition claim as a matter of law. But this Court has determined that these claims do not fail as a matter of law; thus, MGE's unfair-competition claim also survives summary judgment.

### IX. SPOLIATION AND FAKOURI'S DECLARATORY-JUDGMENT ACTION

MGE argues that it is further entitled to summary judgment and the dismissal of Fakouri's counterclaims and affirmative defenses based on Fakouri's spoliation of evidence.  Specifically, MGE points to Fakouri's actions in "intentionally modifying and deleting files from the laptops central to this case." (MGE Mot. for Summ. J. at 49.)  The evidence before this Court is far from clear-cut that Fakouri, Khalil, or Lofton destroyed evidence sufficient to warrant a death-penalty sanction.  (5 Fakouri App. at 1678, 1680-82, 1684, 1693, 1811-15; 2 MGE Consol. App. at 485.) Thus, the Court declines to sanction Fakouri.

Fakouri asserts that it is entitled to a declaratory judgment that MGE's copyright is invalid and unenforceable, that even if MGE has a valid copyright, Fakouri has not infringed it, and that Fakouri is entitled to use its FEE Tool.  Given that Fakouri is not entitled to summary judgment on

these issues, it has likewise not shown its entitlement to a declaratory judgment at this point. Likewise, the parties' requests for attorneys' fees is premature.

## X. CONCLUSION

On the primary causes of action asserted by MGE, the record is replete with fact issues. However, there is no probative evidence raising a genuine issue of material fact on MGE's claims of RICO violations, trademark infringement, or conspiracy.  Accordingly, Fakouri, Khalil, Lofton, DC Group, and Powell are entitled to judgment as a matter of law in their favor regarding RICO violations and trademark infringement.  Fakouri is also entitled to judgment on MGE's claims of conspiracy.

SIGNED March 17, 2006.


TERRY R. MEANS
UNITED STATES DISTRICT JUDGE